## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

SARA R. WRIGHT,

    Plaintiff,

v.

SALES PARTNERSHIPS, INC.

    Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Sara Wright by and through counsel Christopher M.A. Lujan of EMPOWER P.C., respectfully alleges for her Complaint and Jury Demand as follows:

### I.  INTRODUCTION

1. The Defendant, Sales Partnerships, Inc. (hereafter "SPI") is a contact sales organization that uses sales recruitment, training, management, and direct sales to small businesses throughout Colorado and the western region. During her employment interview, Plaintiff notified SPI that she was scheduled to undergo a surgical procedure in August 2019 where the Defendant pre-approved her absence for this surgery. In April 2019, the Defendant hired Plaintiff to promote its' services to small and medium-sized business accounts. Shortly after her surgery in August, Plaintiff unexpectedly learned that she was pregnant and notified by her doctor that she is a high-risk pregnancy. Upon

returning to work after her surgery in September 2019, Plaintiff began to experience disparaging comments about her pregnancy from management—namely about her appearance and her ability to work during her pregnancy. After Plaintiff reported these disparaging comments to her management, the Defendant altered her work conditions to the point where she could no longer successfully meet her performance standards which SPI used as pretext to terminate Plaintiff. Shortly after reporting these disparaging comments to management, Plaintiff was terminated from her position on 23 January 2020. When Plaintiff inquired as to why she was being terminated, the Defendant refused to provide her with a substantive reason and would only mutter that she "was not a correct fit for the company." As a result of Defendant's illegal treatment, Ms. Wright lost her job while she was six months pregnant which caused her to suffer lost wages and benefits, humiliation, loss of future employment opportunities, loss of enjoyment of life, and other significant injuries, damages, and losses.

## II. JURISDICTION AND VENUE

2. Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 *et. seq*.

3. Plaintiff's claim for attorney's fees and costs is proper under the enforcement provisions of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-5 (k).

4. The employment practices alleged herein to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

Venue is proper in this Court pursuant to 28 U.S.C. §1391 (b) and 42 U.S.C. §2000e-5 (f) (3).

## III.   ADMINISTRATIVE PREREQUISITES

5. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) on 09 June 2020 within 300 days of the Defendant's last discriminatory act of terminating her on 23 January 2020.

6. Plaintiff received a Notice of the Right to Sue letter from the EEOC on 29 July 2021.

7. Plaintiff has filed this cause of action less than ninety (90) days after the issuance of the right to sue letter.

## IV.   PARTIES

8. Plaintiff Sara Wright is a citizen of the United States and a resident of the State of Colorado. At all times referred to herein, Ms. Wright was employed by Sales Partnership, Inc.

9. Defendant, Sales Partnership, Inc. registered in good standing to do business in Colorado and is located in the City of Broomfield, Broomfield County, State of Colorado.

10. At all relevant times, Defendant was an employer within the meaning of 42 U.S.C. §2000e, and was engaged in an industry affecting commerce, and employed more than fifteen (15) employees for each working day during the preceding calendar year.

## V.     FACTUAL ALLEGATIONS

11.     Plaintiff began her employment with the Defendant on 24 April 2019 where she was hired as a Quality Assurance Agent earning $80,000 a year.  The Plaintiff also earned a car allowance of $400 per month.

12.     As a Quality Assurance Agency, Plaintiff supported the marketing arm of American Express where it sold its' credit card marketing services to small and medium sized businesses.

13.     The Plaintiff was assigned to support small businesses valued at $3 million dollars or less.

14.     The Plaintiff's goal was to persuade small businesses to allow their customers to use American Express credit cards as a form of payment for their products and services.

15.     The Plaintiff was required to perform ten product placements a day where she would put American Express signage on business storefront windows.

16.     The Plaintiff was required to have fifteen "value discussions" with store owners where she would explain the benefits of allowing customers to use American Express credit cards as a form of payment for their goods and services.

17.     The Plaintiff was required to make over twenty-three stops per day to small and medium size businesses in her marketing territory.

18. Plaintiff would use her personal vehicle to drive to businesses in her marketing territory and would receive $400.00 per month from Defendant to offset the expenses she incurred in fulfilling her marketing duties.

19. Over a period of nine months in 2019, Plaintiff averaged forty-two stops a day. Sometimes during this period, Plaintiff averaged 50-60 stops a day.

20. The Plaintiff maintained written logs of her stops during her workday. Her logs for the month of August 2019 indicate that she made 43.25 stops per day.

21. The Defendant would generate a daily list of businesses for Plaintiff to visit.

22. Several times throughout her employment, Defendant changed Plaintiff's marketing territory.

23. For six months in 2019, Plaintiff's marketing territory was the area including the cities of Arvada, Boulder, Broomfield, and Brighton, Colorado.

24. For three weeks, the Defendant's marketing territory was reduced to only service Boulder, Colorado.

25. For her last month of employment from December 2019 to 23 January 2021, the Defendant suddenly changed Plaintiff's marketing territory to extend from Golden, Colorado to the west, Wheatland, Wyoming to the north, Gunbarrel, Colorado to the Kansas boarder to the east, and back to her residence in Broomfield, Colorado. This territory covers approximately two thousand accounts.

26. During her job interview and prior to being hired by the Defendant, Plaintiff made SPI management aware that she was scheduled to undergo a surgical procedure in

August 2019. SPI management pre-approved this absence and indicated that her absences for this reason would not be a problem. Plaintiff's surgery was for a tubal ligation.

27. Shortly after this surgery, Plaintiff and her husband learned in September 2019 that she was pregnant. Because of her age, the Plaintiff's doctor notified her that she has a high-risk pregnancy which could result in complications for the delivery of her child. Plaintiff's high-risk pregnancy would result in increased monitoring by her doctors to ensure her safety and the safety of her child.

28. During her employment, Plaintiff requested time off for a variety of reasons. In addition to requesting time off for her tubal ligation, Plaintiff also requested time off her medical testing related to her pregnancy; time off to attend the funeral for a family member; and time off to celebrate her wedding anniversary which was approved before she started working for the Defendant. Each of these absences were approved by Plaintiff's supervisors.

29. Despite assurances that these absences were approved by management, Plaintiff later learned that she was deemed absent due to her tubal ligation; absent for medical testing due to her pregnancy; an absence to attend a family funeral; and an absence for celebrating her wedding anniversary with her husband.

30. These absences would be cited by the Defendant in support of its' reason to terminate Plaintiff.

31. Throughout much of her employment, the Plaintiff reported to Todd Rutherford.

32. In October 2019, Plaintiff was supervised by Willard Dean. During his supervision over Plaintiff, Mr. Dean made several disparaging comments about her. On or around 15 October 2019, Mr. Dean told Plaintiff, "you won't be able to wear those shoes much longer because you are going to get fat."

33. During this same month, Mr. Dean made a similar comment to another female employee.

34. Mr. Dean later asked Plaintiff "do you think you'll be able to do this job at that point in your pregnancy?" Despite feeling offended and belittled by Mr. Dean's conduct, she answered that she could still do her job while pregnant.

35. Mr. Dean asked Plaintiff, "why is she still working?" This comment made Plaintiff feel that she should no longer work for the Defendant.

36. Mr. Dean said to Plaintiff that if she wanted a job like the one she has with Defendant, "she shouldn't have done this" meaning get pregnant. Mr. Dean made judgmental comments towards Plaintiff for wanting to see her pregnancy through to delivery.

37. Mr. Dean said to Plaintiff that she would have difficulty reaching her higher sales goals because of her pregnancy.

38. Once Mr. Dean learned of her pregnancy, he worked with others to change her marketing territory to increase added travel time which would result in lower contact numbers with potential customers.

39. Plaintiff also received disparaging comments about her pregnancy from the Defendant's Human Resources department. After Plaintiff notified the HR department

of her pregnancy and what her options were for taking maternity leave, the Defendant's Director of Human Resources, Rebecca Jackson, asked Plaintiff "do you think that you will be able to perform your job duties at 7, 8, 9 months pregnant?"

40. On or about 24 September 2019, Ms. Jackson told the Plaintiff that if she took more than six weeks off for maternity leave, the Defendant would not be able to continue employing Ms. Wright.

41. When Plaintiff told Mr. Dean that the comments by him and Ms. Jackson were hostile and discriminatory towards her pregnancy and her family's decision to keep her child, he became dismissive and said, "you don't know what discrimination is."

42. At the time that Mr. Dean made these comment, Plaintiff had told him that she and her husband would be seeking legal counsel to advise them on how to handle the discriminatory conduct she was suffering from the Defendant.

43. The Defendant changed Plaintiff's sales territory shortly after she complained about Mr. Dean's and Ms. Jackson's discriminatory comments about her pregnancy.

44. The drastic change in Plaintiff's sales territory by the Defendant resulted in her being in the car a majority of the day and reduced the number of contacts she was required to make as a Quality Assurance Agent.

45. The drastic change in Plaintiff's sales territory by the Defendant set her up to fail because she was now forced to travel two to three hours to arrive at her sales territory to start her day and, because of the rural nature of her territory, would force her

to spend hours in her vehicle traveling between business stops resulting in reduced production.

46. On or around 31 October 2019, Mr. Dean was transferred away from Plaintiff and then supervised by Todd Rutherford.

47. After Mr. Rutherford because her supervisor, he had no discussions with Plaintiff about her performance. Mr. Rutherford did not say anything about Plaintiff's excused absences or her sales numbers. At no time during his supervision of Plaintiff did he ever indicate to her that her performance was down and needed to be improved in order for her to keep her job.

48. During her discussions with Mr. Rutherford, Plaintiff told him about the disparaging comments made by Mr. Dean and Ms. Jackson to which he responded that Mr. Dean was out of line, and he should not have said those things.

49. Plaintiff told Mr. Rutherford that she and her husband were considering hiring an attorney to assist them in addressing the discriminatory conduct she was facing from the Defendant. In response to this comment, Mr. Rutherford said he hoped it would not "come to that."

50. Defendant, in January 2020, again changed Plaintiff's supervisor where she was now supervised by Mr. Ryan Stiner.

51. At no time during his supervision did Mr. Stiner say anything about Plaintiff's excused absences or her sales numbers. At no time during his supervision of Plaintiff did he ever indicate to her that her performance was down and needed to be improved for her to keep her job.

52. In January 2020, there were no problems with Plaintiff's attendance or with her ability to meet her sales goals. Despite the drastic change in her sales territory, Plaintiff was still able to meet her sales goals.

53. Mr. Stiner managed the Plaintiff for three weeks.

54. On 23 January 2020, Mr. Stiner called Plaintiff and notified her that she was being terminated.

55. When he notified Plaintiff of her termination, he had no idea why she was being terminated.

56. When Plaintiff called HR to learn why she was being fired, Ms. Jackson only responded by telling Ms. Wright that she was no longer a "correct fit for the company."

57. The Plaintiff was in the third trimester of her pregnancy when she was terminated by the Defendant.

### VI. STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**(Violation of Title VII of the Civil Rights Act of 1964 – Pregnancy Discrimination)**

58. Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

59. At all relevant times, Plaintiff Sara Wright was a member of the protected class as a pregnant female.

60. Plaintiff was subjected to disparate treatment, as described above, and ultimately terminated by Defendant because of her gender and pregnancy, in violation of Title VII of the Civil Rights Act of 1964.

61. The Defendant's discriminatory conduct towards Plaintiff subjected her to disparate treatment in comparison to her similarly situated male colleagues in terms of working conditions, performance standards, and her continued employment.

62. Plaintiff was subjected to a hostile work environment, as described above, and ultimately terminated by Defendant because of her gender and pregnancy, in violation of Title VII of the Civil Rights Act of 1964.

63. The Defendant's continued discriminatory conduct towards Plaintiff was a sufficiently severe or pervasive working environment to alter the conditions of Plaintiff's working environment in her position as a Quality Assurance Agent.

64. As a direct and proximate cause of Defendant's actions, Plaintiff has suffered a loss of income, wages, and other benefits of employment, and experienced mental and emotional pain and suffering.

65. Defendant is therefore liable to Plaintiff for all economic and non-economic damages incurred by Plaintiff because of Defendant's discriminatory actions, as detailed above.

66. Because of Defendant's illegal conduct, the Plaintiff suffered significant economic, consequential, and compensatory damages.

67. Defendant's conduct was the proximate cause of Plaintiff's injuries, damages, and losses.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 12111, *et. seq.*)

68. Plaintiff hereby incorporates all paragraphs of this Complaint as though set forth herein.

69. Plaintiff notified the Defendant on several occasions that she objected to the numerous disparaging remarks she was subjected to by her immediate supervisor Mr. Dean. Plaintiff reported Mr. Dean's misconduct to the Defendant's management team.

70. Ms. Jackson continued Defendant's disparate treatment of Plaintiff by asking if Ms. Wright would be able to continue to be able to work as a pregnant employee.

71. After Ms. Jackson made her comments toward Plaintiff, Ms. Wright reported her conduct to her supervisor, Todd Rutherford. When Plaintiff reported this hostile work environment to Mr. Rutherford, he took no remedial steps to address the discriminatory conduct but admitted that the comments made by Mr. Dean were inappropriate.

72. Reporting discriminatory conduct to the Defendant's management team constitutes a protected activity under Title VII of the Civil Rights Act of 1964.

73. On three occasions, the Plaintiff told the Defendant that she was going to seek legal counsel to assist her in addressing the discriminatory conduct she was facing from her immediate supervisor and the HR department.

74. The Plaintiff's attempts to seek legal counsel in redressing workplace discrimination is a protected activity under Title VII of the Civil Rights Act of 1964.

75.     The Defendant's decision to terminate the Plaintiff constitutes an adverse employment action under Title VII of the Civil Rights Act of 1964.

76.     The Defendant's decision to terminate the Plaintiff several months after she engaged in a protected activity is the temporal proximity required to show that her termination was in retaliation for engaging in a protected activity.

77.     Because of Defendant's illegal conduct, the Plaintiff suffered significant economic, consequential, and compensatory damages.

78.     Defendant's conduct was the proximate cause of Plaintiff's injuries, damages, and losses.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendant, and award her all relief as allowed by law, included, but not limited to the following:

a.     Declaratory relief and injunctive relief, as appropriate;

b.     Actual economic damages as established at trial;

c.     Any economic losses or injuries that Plaintiff has suffered to the present time or which Plaintiff will probably suffer in the future, including but not limited to loss of earnings or damage to her ability to earn money in the future, and other expenses;

d.     Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

    e.    Punitive damages for all claims as allowed by law in an amount to be determined at trial;

    f.    Pre-judgment and post-judgment interest at the highest lawful rate;

    g.    Attorney's fees and costs; and

    h.    Such relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 22nd day of October 2021

*s/ Christopher M.A. Lujan*
Christopher M.A. Lujan, Esq.
Empower P.C
2851 South Parker Road, Suite 316
Aurora, Colorado 80014
720.791.5700 (Office)
720.260.1802 (Mobile)
303.317.8145 (Facsimile)
christopher@empowerlawdenver.com

Attorney for Plaintiff

cc:    Ms. Sara Wright
       ***Via Electronic Mail***